## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Lora Bailey, individually and as Successor in         Case No. 3:12cv02545
Interest to the Estate of Glenni S. Wilsey V,

       Plaintiff,

       v.        **ORDER**

United States of America, et al.,

       Defendants.

This is a wrongful death and survival action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* (FTCA), against two United States Army recruiting officers and the United States of America.

Plaintiff Lora Bailey, individually and as Successor in Interest to the Estate of Glenni S. Wilsey V, alleges the Army, through the defendant recruiters, negligently caused her son's death by instructing him to use dangerous weight-loss methods to meet Army enlistment standards.

Pending is defendants' motion for summary judgment. (Doc. 51).

For the reasons discussed below, I grant the motion.

### Background

In October or November 2010, Wilsey and his friend, Christopher Gibson, joined a fitness club. According to plaintiff, Wilsey told her he joined the club "[n]umber one, to be healthy; number two, to enlist in the military." (Doc. 51-1, Ex.10 at 22:8-17). Gibson testified Wilsey said he had

been "a strong football player [in high school] and he wanted a little more of that back."[1] (Doc. 51-1, Ex. 11 at 15:14-21). The two began to work out together one hour per day, four to six days per week, combining weight training with cardiovascular exercise. (Doc. 51-1, Ex. 11 at 17:7-19:20).

Soon thereafter, on December 7, 2010, Wilsey visited the Army's recruiting station in Sandusky, Ohio. (Doc. 51-1, Ex. 2). During that visit, a recruiting officer, Staff Sergeant Anthony Charles, weighed Wilsey, measured his height and "taped" him to determine his body-fat percentage. (Doc. 51-1, Ex. 2). Sgt. Charles estimated Wilsey weighed 240 pounds and had twenty-seven percent body fat. (Doc. 51-1, Ex. 4).

Sgt. Charles told Wilsey that to meet enlistment standards, he needed to have, at most, twenty-six percent body fat.[2] (Doc. 51-1, Ex. 3, 61:18-23). Sgt. Charles advised Wilsey to "run and do cardio." (Doc. 51-1, Ex. 4).

According to Gibson, Wilsey began researching new workout techniques online. (Doc. 51-1, Ex. 11 at 22:6-10). Wilsey's cardiovascular workouts soon became more frequent and more demanding. (Doc. 51-1, Ex. 10 at 61:1-6, Ex. 11 at 20:12-21:4, 28:12-24). He started to wear sweat-inducing garments under his gym clothes to accelerate weight loss, an idea he told Gibson he heard at the recruiting office. (Doc. 51-1, Ex. 11 at 22:6-24:8). A recruiter also gave Wilsey a neoprene waist band to wear at night to shrink his waist for the body-fat measurement. (Doc. 51-2, Ex. 17 at 43:18-46:24).

---

[1] Wilsey also worked with a personal trainer during high school and competed in weightlifting. (Doc. 51-1, Ex. 10 at 15:18-16:1, 16:20-21, 18:15-19:13).

[2] The Army has two methods for determining height and weight eligibility. A recruit can meet enlistment standards by either: 1) weighing 190 pounds or less, or 2) having a body-fat percentage of twenty-six percent or less. (Doc 51-1, Ex. 3 at 61:8-62:13, Ex. 9).

Around this time, Wilsey changed his dietary habits.  He consumed fewer than 800 calories per day, purged himself if he ate too much and drank large quantities of water. (Doc. 51-1, Ex. 10 at 57:6-15, 66:12-16). Plaintiff testified Wilsey told her Army recruiters had instructed him to take these measures, and also to take over-the-counter weight loss pills. *Id.*

On January 27, 2011, Sgt. Charles weighed Wilsey again. He weighed 219 pounds with twenty-four percent body fat. (Doc. 51-1, Ex. 2, Ex. 6). He thus had lost twenty-one pounds in about six weeks.  Although he had, at that point, satisfied the Army's body-fat requirement, he continued his weight-loss program.

On February 11, 2011, Wilsey enlisted in the Army. (Doc. 51-1, Ex. 1). On that day, he weighed 211 pounds with twenty-three percent body fat. (Doc. 51-1, Ex. 9). He had lost an additional eight pounds in about two weeks.

By late February 2011, Wilsey weighed 195 pounds. (Doc. 51-1, Ex. 11 at 45:14-20). In total, he had lost approximately forty-five pounds since the beginning of December 2010.

On February 26, 2011, an Army recruiter noted in Wilsey's records that he was "doing well" and was "excited." (Doc. 51-1, Ex. 2).

Less than a week later, on the morning of March 3, 2011, Wilsey's fiancée, Sonnie Rochelle King, found him unresponsive in his home. (Doc. 51-2, Ex. 12 at 69:11-21). Paramedics took him to the hospital, where he was pronounced dead. (Doc. 51-1, Ex. 19).

At plaintiff's request, there was no autopsy. (Doc. 51-2, Ex. 20 ¶ 9). The coroner concluded acute cardiac dysrhythmia to be the immediate cause of death, electrolyte imbalance to be a condition leading to death, and dieting to be another significant contributing factor. (Doc. 51-2, Ex. 19, Ex. 20 ¶ 2). He testified he based his conclusion on conversations with plaintiff and King, who

told him Wilsey had been exercising heavily, dieting excessively, purging and taking over-the-counter weight loss supplements. (Doc. 51-2, Ex. 20 ¶ 11).

In October 2012, plaintiff brought this suit against the United States of America, Sgt. Charles and another unnamed Army recruiting officer. (Doc. 1).

Plaintiff alleges defendants negligently caused Wilsey's death by failing to warn him of risks associated with the diet and exercise regimen they instructed him to follow, and by failing adequately to monitor his health during the three-month period before his death. (*Id.* ¶¶ 13-17).

To support her allegations, plaintiff engaged Dr. Jeffrey B. Noftz II, a primary care and sports medicine physician, to opine on the cause of Wilsey's death. (Doc. 51-2, Ex. 21). In his expert report, Dr. Noftz concludes "it is my opinion that Mr. Wilsey's rapid and significant weight loss and the methods used to achieve this weight loss which included extreme low-calorie intake, purging, use of sweat garments and diuretics coupled with the potential for a pre-existing heart valve abnormaility and use of [asthma medication] for wheezing placed him at significant risk for electrolyte abnormalities and lethal cardiac arrythmia." (Doc. 51-2, Ex. 21 at 3).

Dr. Noftz later testified, however, that without an autopsy and premortem blood analysis, it is impossible to make a definitive diagnosis ruling out possible cardiac and non-cardiac causes of death unrelated to Wilsey's diet and exercise regime. (Doc. 51-2, Ex. 22 at 36:19-37:24, 59:1-60:12). He also admitted he lacked "[v]ery important" information regarding Wilsey's activities in the forty-eight hours preceding his death. (*Id.* at 33:4-19).

Defendants' motion for summary judgment contends no reasonable jury could find for plaintiff because: 1) there is no admissible evidence the Army's actions proximately caused Wilsey's

death; and 2) there is no admissible evidence the Army breached a duty of care by failing to protect or aid Wilsey. (Doc. 51).

## Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which the party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## Discussion

Plaintiff brings this action under the FTCA, which limits liability to those "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The events underlying plaintiff's claims occurred in Ohio. Ohio substantive law therefore applies. *See id.*; *Young v. United States*, 71 F.3d 1238, 1244 (6th Cir.1995).

The elements of a wrongful death claim under Ohio law are: 1) death of the decedent; 2) commencement of the action within two years thereafter; 3) a wrongful act, neglect or default of defendant that proximately caused the death and would have entitled the decedent to maintain an

5

action and recover damages had he not died; 4) decedent was survived by a spouse, children, parents or other next of kin; and 5) survivors have incurred damages as a result of the wrongful death. *Mansour v. Woo*, 2012 WL 1493862, *7 (Ohio Ct. App.).

"To maintain a wrongful death action on a theory of negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and death." *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St. 3d 86, 92 (Ohio 1988). Plaintiff must prove negligence by a preponderance of the evidence. *Burks v. Torbert*, 2009 WL 280405, *3 (Ohio Ct. App.).

Here, I find plaintiff fails to offer evidence sufficient to prove: 1) defendants proximately caused Wilsey's death, and 2) defendants owed Wilsey a duty of care.

### A. No Proximate Cause

"Proximate cause is generally established where an original act is wrongful or negligent and, in a natural and continuous sequence, produces a result that would not have taken place without the act." *Petre v. Norfolk S. Ry. Co.*, 458 F. Supp. 2d 518, 527 (N.D. Ohio 2006).

Plaintiff must do more than merely show defendant caused a condition that provided opportunity for other causal agencies to act. *See Whiting v. Ohio Dep't of Mental Health*, 141 Ohio App. 3d 198, 203 (2001). Rather, plaintiff must prove defendant's negligence, "*in probability*, proximately caused the death." *Wells v. Miami Valley Hosp.*, 90 Ohio App. 3d 840, 848 (Ohio Ct. App. 1993) (emphasis in original).

Proximate cause usually is a question of fact. *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 564 (6th Cir. 2006). If, however, "plaintiff's evidence on the issue of proximate cause requires mere

speculation or conjecture to determine the cause of the event at issue, then the defendant is entitled to summary judgment." *Id.*

Defendants argue plaintiff cannot prove their actions proximately caused Wilsey's death because: 1) plaintiff's only evidence the recruiters instructed Wilsey to use dangerous weight-loss methods is inadmissible hearsay, and 2) plaintiff's expert witness testimony regarding the cause of Wilsey's death is inadmissible under the Sixth Circuit's "differential diagnosis" test. (Doc. 51 at 20-26; Doc. 64 at 1-8). I agree.

### 1. Hearsay Statements Inadmissible

Hearsay is a statement "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).

Plaintiff alleges Wilsey – a declarant who obviously has not testified in this case – told her, Gibson and King that Army recruiters instructed him to use dangerous weight-loss methods. These statements inarguably are hearsay. *Estate of Jennifer Tierney v. Shellberg*, 2011 WL 4543810, *7-10 (S.D. Ohio) (decedent's statements to plaintiffs and other witnesses inadmissible hearsay); *Ferrar v. Fed. Kemper Life Assurance Co.*, 198 F. Supp. 2d 940, 949 (S.D. Ohio 2002) (same).

Plaintiff does not contend otherwise. Instead, she points to Ohio R. Evid. 601, governing competency of witnesses, and 804(B)(5), permitting introduction of a decedent's hearsay statements that tend to rebut testimony of an adverse party. (Doc. 61 at 12 (citing *Johnson v. Porter*, 14 Ohio St. 3d 58, 62 (1984))).

Plaintiff's argument is misguided. Where state substantive law applies, state law controls determination of competency of witnesses. Fed. R. Evid. 601; *Legg v. Chopra*, 286 F.3d 286, 291

(6th Cir. 2002). But federal law generally governs *admissibility* of evidence. *Bell v. United States*, 854 F.2d 881, 885 (6th Cir. 1988) (federal law governs procedural issues in FTCA action). Plaintiff does not explain why a state evidentiary rule should apply to admissibility in this case.

Under the applicable federal evidentiary rules, hearsay is not admissible evidence unless covered by an exception. Fed. R. Evid. 802. Federal Rule of Evidence 804 sets forth exceptions to the general rule against hearsay when a declarant is unavailable: 1) former testimony; 2) a statement under the belief of imminent death; 3) a statement against interest; 4) a statement of personal or family history; 5) the residual exception under Rule 807; and 6) a statement offered against a party that wrongfully caused the declarant's unavailability.

None of Wilsey's hearsay statements fit within any of these exceptions.

With respect to the residual exception under Rule 807, Wilsey's statements do not bear "equivalent guarantees of trustworthiness" to those underlying Rules 803 and 804. Fed. R. Evid. 807. Whether a statement possesses the requisite indicia of trustworthiness depends on the circumstances surrounding the hearsay statement and "rendering the declarant particularly worthy of belief." *United States v. Canan*, 48 F.3d 954, 960 (6th Cir. 1995). A lack of corroborating circumstances may indicate a lack of circumstantial guarantees of trustworthiness. *See United States v. Hunt*, 521 F.3d 636, 644 (6th Cir. 2008).

Here, there simply is no way to assess the credibility and reliability of Wilsey's statements to plaintiff, King and Gibson.

No doubt Wilsey's desire to enlist in the Army motivated him to lose weight. But his statements to plaintiff and Gibson that health concerns also motivated him suggest his own personal objective, rather than any demands Army recruiters made on him, played a role in his regime. *See*

*Bourjaily v. United States*, 483 U.S. 171, 177-78 (1987) (court is not bound by rules of evidence – except those relating to privileges – when determining admissibility). Indeed, he chose to continue his drastic weight-loss program even after he had satisfied Army enlistment standards.[3]

Moreover, Gibson and Wilsey's brother, Christian Wilsey, both testified Wilsey never complained to them recruiters were making unreasonable or unrealistic demands, or instructing him to use dangerous weight loss methods. (Doc. 51-1, Ex. 11 at 51:1-6; Doc. 51-2, Ex. 18 at 34:5-18). To the contrary, Gibson testified Wilsey found advice, the content of which is, necessarily, unknowable, about weight-loss methods online. (Doc. 51-1, Ex. 11 at 22:6-10).

No doubt Wilsey might have made the statements at issue. No doubt that is what the recruiters, in whole or in part, might have told him to do to lose weight. But that is not the standard. I am required to take a restrictive view of the residual exception under Rule 807. *See FTC v. E.M.A. Nationwide, Inc.*, 2013 WL 4545143, *2 (N.D. Ohio) (Rule 807 to be used "rarely" and only in "exceptional circumstances"). The requisite indicia of trustworthiness underlying the specific exceptions in Rules 803 and 804 simply are not present here.

Accordingly, I find Wilsey's statements about what Army recruiters told him to do to be inadmissible hearsay.[4] As such, I may not consider them. *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) ("[H]earsay evidence cannot be considered on a motion for summary

---

[3] This fact poses an additional problem for plaintiff's causation argument. Whatever the recruiters might have instructed Wilsey to do, he was still alive at the time he enlisted. His death several weeks later resulted from his decision to continue his extreme diet and exercise program even after meeting enlistment standards.

[4] Plaintiff's SF 95 attachment (Doc. 51-2, Ex. 23), also based on Wilsey's hearsay statements, is likewise inadmissible. *See Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994) (documents based on inadmissible hearsay are also inadmissible).

judgment."); *Estate of Jennifer Tierney*, 2011 WL 4543810, *7 ("A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of fact.").

## 2. Expert Testimony Inadmissible

Plaintiff alleges the dangerous weight-loss methods Army recruiters instructed Wilsey to use caused him to die from acute cardiac dysrhythmia. Where, as here, the causal connection between alleged negligence and injury is beyond common knowledge and understanding of the jury, a plaintiff must present expert testimony. *Burks*, 2009 WL 280405, *4 n.2. To that end, plaintiff offers testimony from Dr. Noftz.

Federal Rule of Evidence 702 governs admissibility of all types of expert testimony. The Rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

According to *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), a court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." The court must consider "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592-93.

The Rule 702 inquiry is a "flexible one," and "[t]he focus must be solely on principles and methodology, not on the conclusions they generate." *Id.* at 594-95. An expert who presents

testimony must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

In *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 179 (6th Cir. 2009), the Sixth Circuit applied *Dauber* to fashion a standard for assessing reliability of expert medical-causation testimony. The so-called "differential diagnosis" test states:

> A medical-causation opinion in the form of a doctor's differential diagnosis is reliable and admissible where the doctor (1) objectively ascertains, to the extent possible, the nature of the patient's injury, (2) "rules in" one or more causes of the injury using a valid methodology, and (3) engages in standard diagnostic techniques by which doctors normally rule out alternative causes to reach a conclusion as to which cause is the most likely.

*Id.* (citations omitted; internal quotation marks omitted).

With respect to the third "rules out" prong, if the doctor "engage[s] in very few standard diagnostic techniques by which doctors normally rule out alternative causes," the doctor must offer a "good explanation as to why his or her conclusion remain[s] reliable." *Id.* (citations omitted; internal quotation marks omitted). The doctor must also provide a reasonable explanation as to why "he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause." *Id.* (citations omitted; internal quotation marks omitted).

The Sixth Circuit elaborated on the "differential diagnosis" test in *Tamraz v. Lincoln Electric Co.*, 620 F.3d 665 (6th Cir. 2010). In *Tamraz*, the court rejected an expert witness's causation testimony, which sought to demonstrate manganese exposure caused plaintiff's Parkinson's disease, as unreliable under *Daubert* and, therefore, inadmissible. *Id.* at 674.

11

The court held the expert's opinion unreliable because "his efforts to 'rule in' manganese exposure as a possible cause or to 'rule out' other possible causes turned on speculation, not a valid methodology." *Id.*; *see Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 678 (6th Cir. 2011) (rejecting medical-causation testimony where expert failed to "rule out" alternative causes).

In particular, the expert's hypothesis concerning the relationship between manganese exposure and Parkinson's disease, albeit plausible, relied on speculation and was not the "product of reliable principles and methods," as Rule 702 requires. *Tamraz*, 620 F.3d at 670.

Applying the Sixth Circuit's "differential-diagnosis" test to Dr. Noftz's testimony, I conclude his methodology does not meet the minimum threshold for admissibility.

Dr. Noftz formed his opinion relying principally on medical records, the death certificate, a coroner's report and plaintiff's (inadmissible)[5] SF 95 attachment. (Doc. 51-2, Ex. 22 at 9:19-16:9). While these materials may suffice to "rule in" electrolyte imbalance as a potential cause of Wilsey's cardiac dysrhythmia, they are not sufficient to "rule out" possible cardiac and non-cardiac causes of death unrelated to Wilsey's diet and exercise regime. *See Tamraz*, 620 F.3d at 670.

Dr. Noftz himself testified it was impossible to rule out many common causes of sudden cardiac death without an autopsy or premortem blood analysis. (Doc. 51-2, Ex. 22 at 37:9-24). Dr. Noftz also admitted he did not know what Wilsey's activities were in the forty-eight hours leading up to his death, although such information would be "[v]ery important" to determining the cause of death. (*Id.* at 33:4-19). Nonetheless, Dr. Noftz somehow concludes Wilsey likely died due to "electrolyte abnormalities."

---

[5] *See supra* note 4.

The problem here is, when Dr. Noftz testified it was a "likely scenario" electrolyte abnormalities caused Wilsey's cardiac dysrhythmia, (*id.* at 26:2-13), he went beyond the boundaries of allowable testimony under Rule 702. The etiological component of his conclusion was at best a working hypothesis, not admissible scientific "knowledge." Fed. R. Evid. 702.

While it is plausible excessive exercise and insufficient nourishment may have caused Wilsey's death, *see Tamraz*, 620 F.3d at 670, I conclude Dr. Noftz failed to meet the requisite standard of testifying those factors were the *probable* cause of Wilsey's death. *See Wells,* 90 Ohio App. 3d at 848.

Because the knowledge requirement of Rule 702 requires "more than subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590, I must exclude Dr. Noftz's testimony. *See N. A. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997) (party cannot rely on inadmissible expert report to avoid summary judgment). Without it, plaintiff cannot prove causation. *See Burks*, 2009 WL 280405, \*4 n.2.

### B. No Duty of Care

Even if plaintiff could prove defendants proximately caused Wilsey's death, she could not prevail without also proving they owed Wilsey a duty of care.

A plaintiff must prove by a preponderance of evidence defendant owed plaintiff a duty to recover on a claim for negligence. *See Smith v. United States*, 2013 WL 941564, \*1 (S.D. Ohio). The existence of a duty depends on foreseeability of the injury. *See Barnett v. Beazer Homes Invests, LLC*, 180 Ohio App. 3d 272, 278 (2008). An injury is foreseeable if defendant "knew or should have known that his act was likely to result in harm to someone." *Id.* (internal quotations omitted).

But "foreseeability alone does not necessarily impose a duty to act." *Abrams v. Worthington*, 169 Ohio App. 3d 94, 99 (2006). As a general rule there is no duty for one party to rescue another unless the first party is responsible for the second party's danger. *See Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St. 3d 284, 293 (1997); Restatement (Third) of Torts: Phys. & Emot. Harm § 37 (2012).

An exception to this rule arises when the first party stands in a "special relationship" with the party in distress. *Jackson v. Forest City Enters, Inc.*, 111 Ohio App. 3d 283, 285 (1996). When such a "special relationship" exists, the first party has an affirmative duty to aid or protect the second party, regardless of how the danger arose. *Id.*

Examples of "special relationships" include: 1) a common carrier with its passengers; 2) an innkeeper with its guests; 3) a possessor of land with invitees; 4) an employer with its employees while at work; 5) a school with its students; 6) a landlord with its tenants; and 7) a custodian with those taken into custody. *See* Restatement, *supra*, § 40.

Even in cases where a "special relationship" exists, "when injury flows directly from an act of the injured party himself (or herself), the degree of control which the alleged tortfeasor can exercise over that party is an element of the duty inquiry." *See Estate of Jaycox v. Setty Family Veterans Residential Care Home*, 231 F. Supp.2d 725, 731 (S.D. Ohio 2002) (internal quotation marks omitted).

Plaintiff's argument defendants owed Wilsey a duty of care is twofold: 1) defendants owed Wilsey an ordinary duty of care because Wilsey's death was a forseeable result of their instructions to him, and 2) defendants had an affirmative duty to protect Wilsey from risks resulting from his weight-loss methods because they stood in a "special relationship" with him. (Doc. 61 at 4-12).

14

Defendants counter: 1) there is no duty of care with respect to risks they did not create and could not have foreseen, and 2) their relationship with Wilsey was not such that they owed him an affirmative duty of care. (Doc. 51 at 12-17). I agree.

Plaintiff's reliance on an ordinary duty of care fails because there is no admissible evidence the recruiters were responsible for – or even aware of – Wilsey's risky behavior. *See Bell v. United States*, 4 F. Supp. 3d 908, 919 (S.D. Ohio 2014) (defendant must be responsible for hazard to establish duty). As discussed above, the only evidence plaintiff offers on that point is inadmissible hearsay. *See supra* Part A.1.

Likewise, there is no admissible evidence the recruiters could have foreseen Wilsey's death. Wilsey appeared to be "doing well" and was "excited" less than a week before he died. (Doc. 51-1, Ex. 2). The mere fact he, like many recruits (Doc. 51-1, Ex. 3 at 57:25-59:1), needed to lose weight to meet enlistment standards does not mean the recruiters were aware Wilsey was in danger.

Plaintiff's argument defendants had an affirmative duty to protect Wilsey also fails. I am not aware of any case, and plaintiff cites none, where a court found a "special relationship" based *solely* on the relation of the military to its servicemen or recruits. *See Rodrigue v. United States*, 788 F. Supp. 49, 51-52 (D. Mass 1991) (declining to recognize "special relationship" between United States Air Force and airman who drowned while he was off duty, off base, and engaged in nonmilitary activities). This case will not be the first.

The only recognized "special relationship" that even vaguely resembles Wilsey's relation to defendants is that of employer and employee (at least once Wilsey enlisted in February 2011). That said, there was, I believe, insufficient awareness of the circumstances for a jury to find the recruiters should have been more attentive to how Wilsey was accomplishing his rather staggering

15

weight loss in such a short period. They certainly were not in a position to control Wilsey's risky behavior. *See Estate of Jaycox*, 231 F. Supp. at 731.

Again, the main problem here is the lack of admissible evidence as to any instructions the recruiters gave Wilsey, and what else they might have discussed with him along the way. In fact, the recruiters adamantly denied giving the instructions plaintiff alleges. (Doc. 51-1, Ex. 4; Doc. 51-2, Ex. 14, Ex. 17 at 64:14-20).

In light of the foregoing, I find no reasonable jury could conclude defendants owed a duty to aid or protect Wilsey.

**Conclusion**

Because there is no genuine issue of material fact as to whether defendants proximately caused Wilsey's death or owed a duty of care to him, summary judgment is warranted.

It is, therefore

ORDERED THAT defendants' motion for summary judgment (Doc. 51) be, and the same hereby is, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge